IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ALEK A. HANSEN, *as administrator of*
*the estate of Debra Arbuckle,*

        Plaintiff,

v.                                Case No. 20-2480-JWB

KALEB DAILEY,
*in his individual capacity*,

        Defendant.

## MEMORANDUM AND ORDER

This case is before the court on Defendant Kaleb Dailey's motion for summary judgment. (Doc. 20.)  The motion has been fully briefed by the parties and is ripe for decision.  (Docs. 29, 31.)  For the reasons stated herein, Dailey's motion for summary judgment is GRANTED.

### I.  Uncontroverted Facts

Plaintiff brings this action on behalf of the estate of Debra Arbuckle.  Arbuckle was shot and killed by Dailey, a Sedgwick County Deputy Sheriff, following a vehicle pursuit in the early morning hours of December 30, 2019.  Plaintiff asserts a claim for damages under 42 U.S.C. § 1983, alleging that Dailey's use of deadly force constituted an unreasonable seizure that deprived Arbuckle of her rights under the Fourth and Fourteenth Amendments to the United States Constitution.  (Doc. 1 at 6.)

At about 3:00 a.m. on December 30, 2019, a Wichita Police Department (WPD) officer initiated a traffic stop of a gray Volkswagen sedan by activating his emergency lights.  The officer attempted to make the stop because the Volkswagen had a license plate that was registered to a

Chevy pickup truck. Having an incorrect license plate is a minor traffic infraction. After the Volkswagen failed to stop, ran a red light, and accelerated to speeds of approximately 90 miles per hour, the WPD terminated the pursuit due to the speeds involved. (Doc. 29-1 at 5-6; Doc. 29-4 at 6.)

Sedgwick County Sheriff's Deputies Dailey, Tyler Marrero, Stetson Johnson, and Gareth Adams were on patrol duty on third shift on December 30, 2019. All of these officers were equipped with AXON Flex 2 video cameras that recorded portions of the vehicle pursuit and shooting. The record includes "body cam" and "dash cam" videos from these officers and/or their vehicles, as well as individual still-frame pictures derived from the videos.

By listening to radio traffic, Marrero, Johnson, and Dailey became aware of the WPD's pursuit of a gray Volkswagen with a Tennessee license plate. They heard the WPD officers had discontinued the pursuit. Marrero, Johnson, and Dailey subsequently heard Adams radio that he had located the vehicle at K-15 highway and MacArthur Street and was in pursuit. Sgt. Slay, the deputies' supervisor, was in the squad room when he learned Adams was in pursuit. (*Id.* at 3.) Johnson was about three miles away from Adams' location. (Doc. 29-1 at 6.)

Dailey knew that he and Sgt. Slay were the only ones working the night of December 30 who were TVI certified and that Slay, as a supervisor, would not typically employ a TVI. (Doc. 20 at 3.) TVI, which is short for Tactical Vehicle Intervention, is designed to be a less-lethal technique for stopping potentially dangerous pursuits. Pursuant to the Sedgwick County Sheriff's General Order, only Sedgwick County deputies with two years of service who are trained and certified to use the TVI technique are permitted to employ it during a pursuit, and only with prior supervisor approval. (*Id.* at 2-3.) The General Order also permits the use of "Stinger" or similar tire deflation devices (*i.e.*, spikes), with prior supervisor authority, to stop pursuits. (*Id.*.) As a

result, Dailey left the call he was assisting with and drove east on Kellogg Street to get to the pursuit area and employ a TVI if possible.  (*Id.*)  Dailey knew the WPD had discontinued its pursuit of the vehicle but did not know why.  Dailey was at Kellogg and Dugan in west Wichita when he decided to join the chase, meaning he had to drive across Wichita because the chase was in the far eastern part of Sedgwick County, perhaps 15 minutes away at normal speeds.  Dailey traveled across Kellogg (U.S. Route 400) at speeds in excess of 100 mph and up to a maximum of 142 mph. Dailey heard Adams report there was "no traffic" along the chase route and Dailey saw little traffic. As he drove to join the chase, all Dailey knew was that the Volkswagen driver had committed traffic violations, it was eluding officers, and the license tag was not assigned to the Volkswagen. (Doc. 29-1 at 9-10.)

Marrero saw the Volkswagen, a gray four-door sedan with a Tennessee tag, and Adams traveling northbound on K-15, then onto Turnpike Drive, and then east on Pawnee Street.  At some point, dispatch announced the tag was "32," meaning stolen, although the parties agree the tag was not in fact stolen.  Marrero caught up to the pursuit near 159th and Pawnee and took over as lead in the pursuit.  The Volkswagen went east through a private drive and behind a house as Marrero followed it off-road into Butler County, then south on Andover Road, then west back to Sedgwick County on Pawnee at speeds over 100 mph.  Marrero continued to call the vehicle pursuit over the radio.  Dailey heard the pursuit called by Adams and then Marrero.  (Doc. 20 at 3-4.)  At some point during the chase, a Sheriff's deputy crashed his patrol car into a stop sign.

The Volkswagen committed numerous traffic violations as Adams and Marrero pursued it, including at least four instances of running red lights and one instance of running a stop sign. These violations are plainly visible on the video from Adams' vehicle (*see* Doc. 21) (Adams' AXON video labeled "arbuckle,_debra-3[Excerpt]")).  The five violations specified above are plainly

visible at 1:09, 2:26, 2:42, 5:06, and 6:42 of this video.[1]   At other points in the video the Volkswagen can be seen driving in the wrong lane against the designated direction of travel, although fortunately there was very little traffic at that hour.  The video also shows that Adams' police lights and siren were on and would have been visible and/or audible to a reasonable person driving the Volkswagen.  Adams called out the violations over the radio as they occurred or shortly thereafter.  *Id.  See also* Doc. 20-3 at 1 (Johnson affidavit); Doc. 20-4 at 1 (Slay affidavit).  Dailey alleges that by virtue of such violations, the driver of the Volkswagen committed the Kansas felony offense of fleeing and eluding a police officer. (Doc. 20 at 4.[2])

Johnson drove to Pawnee and Webb Road to set up road spikes.  Dailey was in position as the lead patrol vehicle in the pursuit by that time.  Adams deployed spikes near the intersection of 127th Street East and Pawnee in Sedgwick County.  The Volkswagen drove over the spikes set up by Adams at over 100 mph.  After it hit the spikes, the Volkswagen slowed down to 90 mph.  The Volkswagen then hit the spikes set up by Johnson near Pawnee and Webb.  Just before the Volkswagen turned north from Pawnee on to Webb Road, the rubber from one of the wheels came off of the car. (Doc. 20 at 4-5.)  Dailey saw rubber come off the rim of the front passenger wheel. (Doc. 29-2 at 41.)

The Volkswagen continued driving on the rim.  Dailey attempted a TVI by bumping the rear of the Volkswagen, which caused it to swerve, but the Volkswagen driver straightened out the car and kept driving.  (Exh. I, Dailey Body Cam 2 at 7:55-8:01.)  Dailey allowed the Volkswagen to move back in front of him as he attempted a second TVI.  As a result of this second TVI, the

---

[1] In view of this uncontroverted evidence the court does not address whether the videos show additional moving violations.

[2] Plaintiff attempts to controvert Dailey's allegations by citing generally to "Marrero Body Cam 2" (Doc. 29-1 at 2), but that unexplained assertion fails to show or explain why the allegation that the driver's actions constituted a felony under K.S.A. 8-1568(b) is unsupported.  *See* D. Kan. R. 56(e) ("All responses must fairly meet the substance of the matter asserted.")

Volkswagen rotated all the way around the front of Dailey's car.  As it rotated, Dailey saw through the front windshield that the driver was the only occupant of the front seats. He could not see if anyone was in the back seats.  (Doc. 29-2 at 9-10; Exh. I, Dailey Body Cam 2 at 8:11.)  The driver of the Volkswagen was again able to straighten out the car and continue driving north on Webb. A radio transmission indicated the Volkswagen was traveling at 5 mph.  (Doc. 29-1 at 12.) Dailey's body cam video, however, shows that even after the use of spikes and with at least one apparent flat tire, the Volkswagen was able to travel at speeds exceeding 20 mph. (*See e.g.*, Exh. I, Dailey Body Cam 2 at 9:50).  Dailey got behind the car again.  The Volkswagen turned westbound into a residential neighborhood.  Dailey attempted another TVI as the Volkswagen turned west from Webb onto Mount Vernon Street.  As Dailey's car made contact, the Volkswagen angled toward the south curb on Mount Vernon and came to a stop at the curb with its right front tire – or more accurately the rim – up on the south curb.  (Doc. 20 at 5-6.)  Part of the rear bumper covering of the Volkswagen had come loose and was hanging down.  The Volkswagen driver could not go forward due to a tree in front of the vehicle.  (Doc. 29-1 at 12.)  Dailey stopped his car slightly behind and to the west of the Volkswagen and Marrero parked his car behind and just to the east of the Volkswagen.[3]

     The aerial photograph below (apparently taken some time during daylight hours after the incident) illustrates the relative positions of the patrol vehicles and the dark grey Volkswagen near

---

[3] Plaintiff contends that "[t]he Volkswagen could not back out in reverse because Deputy Marrero parked his vehicle behind the Volkswagen, to the east," as well as that the Volkswagen "was completely surrounded by the patrol vehicles," was "disabled," and "was blocked in and could not drive away from the area."  (Doc. 29-1 at 12-13.)  All of these assertions are refuted by the video recordings and other evidence showing that the Volkswagen was not only capable of backing out, but in fact did so.  Dailey testified he assumed Marrero would pull in directly behind the Volkswagen to keep it from backing up, but Marrero "didn't park directly behind the vehicle" and "ended up parking further off to the side to the – further to the east."  (Doc. 29-2 at 45.)  Dailey "realized that [Marrero's car] wasn't significantly blocking the vehicle in and that the vehicle could still back out of there…."  (*Id.* at 63.)

its original stopping point on the south curb of Mount Vernon.[4]  Dailey's patrol car, without a

number stenciled on top, is north and slightly west of the Volkswagen. [North is towards the top

part of the picture; west is toward the left.]   Marrero's patrol car, with "883" on top, was behind

(east) of the Volkswagen.  Johnson's patrol car, with "885" on top, stopped next to the north curb.

Sgt. Slay's patrol vehicle, with "951" on top, stopped behind Marrero's car near the south curb.

(*Id.* at 6.)



---

[4] The picture does not depict the position of the Volkswagen at its original stopping point or at the time the shots were fired.  The body and dash cam videos show the Volkswagen backed up close to Marrero's car (883) when the shots were fired.  There is evidence that at some point after the shooting, "[t]he Volkswagen lurched forward … and then stopped."  (Doc. 20-3 at 5.)

(Doc. 20 at 7.)

Dailey, Marrero, and Johnson got out of their vehicles to perform a felony stop.[5]   Dailey testified he intended to arrest the driver for "[f]elony flee and elude as well as the traffic violations, including the tag being unassigned."  (Doc. 29-2 at 47.)  The windows of the Volkswagen were tinted dark and none of the deputies could see inside the vehicle.  As shown by Dailey's body cam video, Dailey was near the rear bumper of the Volkswagen when he got out of his vehicle.  (Exh. I, Dailey Body Cam 2 at 9:26.)  Dailey walked back from the Volkswagen and initially moved toward Marrero's car (883). He intended to join in a line with the other officers, behind cover, facing the vehicle from multiple angles.  (Doc. 29-2 at 46.)  Marrero was behind his open driver's door.  Dailey intended to use Marrero's car for cover, but before he could do so Johnson moved toward the passenger side of Marrero's vehicle, advancing near where Dailey intended to go.  (Doc. 20-1 at 3.)  Johnson intended to open the front passenger door of Marrero's vehicle for cover, but never had time to do so.  (Doc. 20 at 8-9.)  Dailey was to Johnson's right (west) in the street. Dailey, Johnson, and Marrero all had their handguns pointed at the Volkswagen.

Marrero yelled, "Driver.  Turn the car off."  Sgt. Slay got out of his car (951) and approached the driver's side of Marrero's car.  The driver did not turn the car off.  When Marrero yelled, Dailey glanced to his left toward Marrero and Johnson.  At that point Johnson was just behind the rear bumper of Marerro's car, moving toward the passenger side of Marrero's car. (Exh. I, Dailey Body Cam 2 at 9:28; Doc. 20-1 at 3.)  Dailey stopped moving toward Marrero's car, as he did not want to cross in front of Johnson or get behind him where Johnson would be in his line of fire.  (Doc. 20-1 at 3.)

---

[5] "In such a stop the officers, rather than approach the stopped vehicle, stay back and order the occupants of the vehicle to show their hands, exit the vehicle, and walk back to the officers' position. It is also typical during felony stops for officers to unholster their guns. These measures are meant to ensure the safety of everyone involved—the occupants of the vehicle, the officers, and the public." *United States v. Williams*, 843 F. App'x 111, 113 (10th Cir. 2021)

Johnson's dash cam shows that, within a few seconds of the Volkswagen's initial stop, the rear brake lights on the vehicle lit up.  (Exh. K, Johnson Dash Cam at 1:35.)  In the next few seconds, the brake lights went off and then came on again just before the Volkswagen's backup lights came on.  A second or two later – just after Johnson moved near Marrero's front passenger door – the Volkswagen began to back up.  (Exh. J, Johnson Body Cam at 1:59; Exh. K, Johnson Dash Cam at 1:40; Exh. I, Dailey Body Cam 2 at 9:31.)  Dailey saw the Volkswagen had its backup lights on.  He heard the rim slipping and grinding against the curb.  (Doc. 20-1 at 3.)  The Volkswagen then gained traction and began to accelerate backwards.  (*Id.*)  Marrero yelled, "Hey, back up, back up."  (Exh. M, Marrero Body Cam at 19:18; Exh. O, Sergeant Slay Body Cam at 1:58.)  Marrero's testimony is that he "thought … the Volkswagen was going to hit someone." (Doc. 20-2 at 3.)  Johnson's body cam video shows that when he saw the car backing up in his direction he exclaimed, "hey, hey," and started moving backwards behind Marrero's car to get out of the path of the Volkswagen.  (Exh. J, Johnson Body Cam at 1:59.)  Johnson's body cam and dash cam videos show beyond any reasonable dispute that the Volkswagen was backing up in Johnson's general direction and that his initial position along the passenger side of Marrero's car placed him in or near the path of the Volkswagen.  (Exh. J, Johnson Body Cam at 1:59; Exh. K, Johnson Dash Cam at 1:42.)  As the Volkswagen was backing up, Dailey yelled, "stop, stop," and then fired six shots from his handgun in rapid succession into the passenger window and door at the driver of the Volkswagen, at a slightly downward angle.

With the aid of slow-motion replay of various videos, it can be seen that when Dailey first yelled "stop," Johnson was still on the passenger side of Marrero's car, at the rear of the vehicle, backing away from the Volkswagen.  (Exh. J, Johnson Body Cam at 2:00; Exh. K., Johnson Dash Cam at 1:43.)  Johnson continued backing up and then around behind Marrero's rear bumper

toward the driver's side of Marrero's car.  A jury could find from the videos that Johnson had just moved from the passenger side to behind Marrero's rear bumper when Dailey yelled "Stop" the second time and fired.  (Exh. K, Johnson Dash Cam at 1:43-44.)  Although darkness makes it difficult to see Johnson on his patrol vehicle's dash cam video, that video indicates Johnson passed on a line between Johnson's dash cam and Marrero's rear passenger-side tail-lights – indicating Johnson moved behind Marrero's car – a fraction of a second before Dailey fired the first shot. (*Id.*)  The Volkswagen continued moving backwards as Dailey fired the first several shots.  (*Id.*) Johnson continued backing away from the Volkswagen and crouched near Marrero's rear bumper as Dailey fired the last few shots.  (Exh. K, Johnson Dash Cam at 1:43; Exh. J, Johnson Body Cam at 2:00-2:02.)

Dailey's body cam video shows that, from Dailey's perspective, the Volkswagen was backing up close to Marrero's car, with its rear bumper almost even with Marrero's front bumper by the time Dailey yelled "stop." (Exh. I, Dailey Body Cam 2 at 9:33.)  The Volkswagen continued backing up such that its rear bumper was somewhere midway along the passenger side of Marrero's car – in the area where Johnson had initially positioned himself – when Dailey yelled "stop" the second time and fired.  (*Id.* at 9:34.)  Marrero's car is a Dodge Ram Charger, which is about 16 feet long.  The Volkswagen continued backwards after the first two or three shots such that its rear bumper was almost parallel with Marrero's rear bumper.  (*Id.* at 9:38.)  The videos show beyond reasonable dispute that once the Volkswagen began backing up and gained momentum, it took no more than a couple of seconds for it to back up to the area where Johnson had initially positioned himself alongside Marrero's car.

Johnson's dash cam video also shows the Volkswagen initially angled toward Marrero's car when it began backing up.  The front wheels then turned to the right, causing the rear of the

Volkswagen to angle away from Marrero's car and the front of the Volkswagen to angle closer to Marrero's vehicle.  It also shows that after Dailey yelled "stop," the brake lights of the Volkswagen came on as the vehicle turned, but the vehicle continued backwards as Dailey yelled, until several shots were fired, when it came to a stop.  (Exh. K, Johnson Dash Cam at 1:43-44.)

The parties agree the videos recorded at 30 frames per second – or about 0.034 seconds per frame – meaning the time lapse between two frames can be determined by counting the number of frames and multiplying by 0.034 seconds. (Doc. 20 at 2.)  The Volkswagen backup light came on at frame 17071 of Dailey's body cam video.  (*Id.* at 10.)  The Volkswagen began to move backwards about 1.66 seconds after the backup light came on.  (Doc. 20-6 at 5.[6])  In the next three seconds as the Volkswagen was backing up, Slay yelled, "Back up. Back up," Johnson began to move backwards, and Dailey yelled, "Stop. Stop." (*Id.* at 7.[7])  Dailey fired the first shot about 0.17 seconds after his second "stop" warning.[8]  The total elapsed time from Dailey's first shot to his last shot was 1.19 seconds.[9]  Less than 5 seconds total elapsed from the time the Volkswagen backup light first came on until Dailey's first shot.  (Doc. 20 at 10.[10])  All of Dailey's shots were fired through the passenger window and door of the Volkswagen.  (Doc. 29-2 at 14.)

The driver, Debra Arbuckle, died from a gunshot wound to the head.  One of the shots entered her right ear and followed a path through the right ear, the first and second cervical vertebrae transecting the cervical spinal cord, and into the paraspinal muscles of the left posterior (rear/back).  (Doc. 20 at 10-11.)

---

[6] Frame 17120-17071= 49 frames x .034 seconds = 1.66 seconds.
[7] Frame 17208-17120 = 88 frames x .034 seconds = 2.99 seconds.
[8] Frame 17213-17208 = 5 frames x .034 seconds = 0.17 seconds.
[9] Frame 17248-17213 = 35 frames x .034 seconds = 1.19 seconds.
[10] Frame 17213-17071 = 142 frames x .034 seconds = 4.828 seconds.

Dailey's affidavit states that he "heard the Volkswagen engine revving" and "could hear the rim slipping" on the curb.  (Doc. 20-1 at 3.)  The revving of the Volkswagen engine just before it backed up can clearly be heard on Dailey's body cam video.  (Exh. I, Dailey Body Cam 2 at 9:30-31.)  Dailey states that as the Volkswagen accelerated backwards, "I thought Deputy Johnson was going to be run over by the Volkswagen."  (Doc. 20-1 at 3.)  He also states that he saw the front tire of the Volkswagen "starting to angle as though the driver was trying to pull out to drive west at me" and he "believed both Deputy Johnson and I were in imminent danger of death or great bodily harm."  (*Id.*)  Dailey states that he fired six shots at the driver and that "I stopped firing because I saw the Volkswagen stop backing up."  (*Id.*)  Dailey testified he had 18 total rounds in his weapon that night.  (Doc. 29-2 at 10.)

Johnson's testimony is that he heard the engine on the Volkswagen "rev up" and "then the Volkswagen started to rapidly back up towards me" and "I thought the Volkswagen was going to hit me or someone else and kill somebody."  (Doc. 20-3 at 3.)  Johnson said he "moved to get behind Deputy Marrero's car," and he "heard several gunshots" and "ducked behind Deputy Marrero's car for cover."  (*Id.*)  Johnson testified that he considered shooting at the driver but did not because he was running to get behind Marrero's car.  (Doc. 29-3 at 11.)  Johnson conceded that once he was behind Marrero's car, he was in a safe spot and did not have any reason to shoot at the driver.  (Doc. 29-3 at 11-12.)

Slay's affidavit states that when the Volkswagen began to back up, he "was immediately afraid that the two deputies on the right side of Deputy Marrero's car were going to be hit.  There was little room between Deputy Dailey's car, the Volkswagen, and Deputy Marrero's car and both Deputy Dailey and Deputy Johnson were in that space."  (Doc. 20-4 at 3.)  Slay further stated he believed Dailey was in his line of fire, so he "moved towards the rear of Deputy Marrero's car to

11

get an angle to shoot at the driver of the Volkswagen and end the threat to Deputy Dailey and Deputy Johnson." He "saw Deputy Dailey move away to the north and west and saw Deputy Johnson retreat backwards." (*Id.*)

Plaintiff alleges that before Dailey fired his weapon – the allegation does not specify precisely when – Dailey "saw that Deputy Johnson was behind the cover of Deputy Marrero's vehicle." (Doc. 29-1 at 21.) To the extent that allegation asserts that Dailey saw Johnson was behind cover immediately before he fired, it is not supported by the materials cited. Plaintiff cites five-second and ten-second video excerpts from Dailey's body cam and Johnson's dash cam, respectively. (*Id.*) The videos do not reasonably show that Dailey was able to see that Johnson was protected by cover at the time he fired. To begin with, Dailey's head-mounted[11] body cam indicates Dailey was looking at the Volkswagen and its passenger compartment as it backed up, not looking back towards Johnson, both before and as he fired at the vehicle. Johnson's dash cam does indicate Johnson managed to get behind Marrero's rear bumper just before Dailey fired the first shot and that he continued toward the driver's side of Marrero's car. But it does not show that Dailey was able to see that Johnson was behind cover before Dailey started shooting. And given the split-second timing between the Volkswagen suddenly backing into the area where Johnson was initially positioned, Johnson's retreat to get behind Marrero's car, Dailey's observance of the Volkswagen and his attempts to warn it to stop, and Dailey's window for using force to prevent the Volkswagen from reaching Johnson, the dash cam does not reasonably support an inference that Dailey could see that Johnson was behind the cover of Marrero's vehicle before he began shooting.

---

[11] Doc. 20-1 at 1.

The following image from Johnson's body cam shows Johnson's position a few seconds before the shooting as the Volkswagen was about to back up.  At the right of the image is Dailey with his gun pointing at the Volkswagen.  To the left of Dailey's image are the taillights (a red band) of Dailey's patrol car.  To the left of those taillights are the emergency lights (red, white, and blue, distorted) on top of Dailey's car.  To the left of the emergency lights are the taillights of the Volkswagen.  Just to the left of the Volkswagen's left taillight are Johnson's outstretched arms and hands with his firearm pointing at the Volkswagen.  Just to the left and slightly below Johnson's hands is the passenger side of Marrero's car and Marrero's side view mirror.



(Exh. J, Johnson Body Cam at 1:58.)

Below is an enlarged excerpt from the above picture showing faint images of the passenger side of Marrero's car and the side view mirror, as well as the front passenger-side wheel of Marrero's vehicle.  It also shows the left rear quarter of the Volkswagen just to the right of, and partially obscured by, Johnson's hands.



(*Id.*)

The following image from Johnson's dash cam shows the Volkswagen a few seconds before the shooting as it backed up between Marrero's car and Dailey's car. Just to the left of the red Volkswagen taillight, there is a white area against which the outline of the Volkswagen's left side-view mirror can be seen. Just to the left of the white area is a dark shape that is Johnson's silhouette along the passenger side of Marrero's car.



(Exh. K, Johnson Dash Cam at 1:41.)

The following image from Dailey's body cam shows the Volkswagen about to back up. The headlight of Marrero's car (passenger side) is visible on the left side of the image.



(Exh. I, Dailey Body Cam 2 at 9:30.)

The following image from Dailey's body cam a few seconds later shows the Volkswagen as it was backing up near Marrero's car and as Dailey first yelled "stop." Marrero's passenger-side headlight is visible in the upper left part of the image.  Dailey's outstretched hand and firearm are visible on the right-center of the image.



(Exh.I, Dailey Body Cam 2 at 9:33.)

The following image from Slay's body cam shows the Volkswagen, located between Marerro's and Dailey's cars, after it began backing away from the curb.



(Exh. O, Slay Body Cam at 2:00.)

The following image from Slay's body cam, taken just after the above image, shows that Slay turned to his right and saw Johnson retreating to the rear of Marrero's vehicle to get out of the path of the Volkswagen as it was moving toward his position.



(Exh. O, Slay Body Cam at 2:00.)

The following image from Johnson's body cam shows the Volkswagen as it was backing up and as Johnson was retreating. It shows Johnson had retreated behind the emergency light bar (blue and white, distorted) on top of Marrero's car. The silhouette of Marrero's side view mirror and a reflection (red and white) on Marrero's passenger side windows are visible to the left of Johnson's arm and hand.



(Exh. J, Johnson Body Cam at 1:59.)

The following image from Johnson's body cam a fraction of a second later shows Johnson still near the passenger side of Marrero's vehicle as the Volkswagen continues backwards towards Johnson. The bright white/yellow light on the left of the image is the light bar on top of Marrero's car.



(Exh. J, Johnson Body Cam at 2:00.)

The following image from Johnson's body cam a fraction of a second later shows that, just prior to the shooting, and as Johnson was rounding the back of Marrero's car, the rear bumper of the Volkswagen was nearly on a line between Johnson and the rear of Dailey's car.



(Exh. J, Johnson Body Cam at 2:00.)

The following image from Johnson's body cam, taken a fraction of a second after the above image, shows Johnson retreating to get behind Marrero's rear bumper.  The yellow light on the left side of the image is an emergency light in the rear window of Marrero's car, which is located forward of the vehicle's trunk compartment.  Toward the center of the image, just below Johnson's hand, is the rear driver-side wheel and mangled bumper of the Volkswagen.   The Volkswagen's taillights are obscured by Johnson's hand.



(Exh. J, Johnson Body Cam at 2:00.)

The following image from Johnson's body cam, taken a fraction of a second after the above image, shows Johnson's position after two shots had been fired by Dailey. The red and white blurs of light near Johnson's outstretched arm are from the taillights of the Volkswagen. The red blur at the bottom left of the image is from Marrero's passenger-side taillight.



(Exh. J, Johnson Body Cam at 2:00.)

The following image from Johnson's dash cam, taken a fraction of a second before the shots, shows Johnson's silhouette near the rear of Marrero's car.  Johnson is partially blocking the right side of Marrero's rear taillight.



(Exh. K, Johnson Dash Cam at 1:43.)

The following image from Dailey's body cam shows the position of the Volkswagen relative to Dailey immediately before Dailey fired the first shot.



(Doc. 20-6 at 7.)

The following image from Dailey's body cam, taken 2.78 seconds[12] after the last shot was fired, shows the position of the Volkswagen (right) relative to the passenger-side (red) taillight of Marrero's car (left).



(Doc. 20-1 at 8.)

---

[12] The frame shown [173301] was 82 frames after the final shot [17248]; 82 x .034 seconds = 2.788 seconds. (Doc. 20-6 at 8.)

The following image from Dailey's body cam [frame 17525], taken 9.4 seconds after the final shot as Dailey moved around behind the Volkswagen and towards the other officers, again shows the relative positions of the Volkswagen (right) and Marrero's car (left).



(Doc. 20-1 at 9.)

The following image from Slay's body cam shows the position of Marrero's car and the Volkswagen seconds after the shooting.



(Exh. O, Slay Body Cam at 2:04.)

## II. Legal Standards

### A. Summary Judgment.

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986) (emphases in original). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury

could find in favor of the nonmoving party on the evidence presented." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quotation marks omitted).

The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). If the moving party meets its burden, the nonmoving party "must do more than refer to allegations of counsel contained in a brief to withstand summary judgment. Rather, sufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (quotation marks omitted). *See Redd v. City of Oklahoma City*, No. 20-6145, 2021 WL 3909982, at *3 (10th Cir. Sept. 1, 2021). Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court views the evidence and all reasonable inferences therefore in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### B. Fourth Amendment.

The Fourth Amendment provides in part that "[t]he right of the people to be secure in their persons … against unreasonable searches and seizures, shall not be violated…." U.S. Const. amend. IV.

"A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (citing *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985)). "The objective reasonableness of a particular seizure under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the countervailing governmental interests at stake,'" and requires analyzing the totality of the circumstances. *Id.* (quoting *Graham,* 490 U.S. at 396). The question is analyzed "from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citation omitted.) "We thus 'allo[w] for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'" *Id.* (citation omitted.)

The reasonableness test requires consideration of the particulars of each case, including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *George v. City of Lakewood, Colorado*, No. 20-1259, 2021 WL 3700918, at *4 (10th Cir. Aug. 20, 2021) (quoting *Graham*, 490 U.S. at 396). The second *Graham* factor is "undoubtedly the most important and fact intensive." *Id.* (quoting *Pauly v. White,* 874 F.3d 1197, 1216 (10th Cir. 2017)).

The use of deadly force "is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others." *Redd v. City of Oklahoma City*, No. 20-6145, 2021 WL 3909982, at *11 (10th Cir. Sept. 1, 2021) (citation omitted). "To assess the seriousness of a threat that precipitated an officer's use of deadly force, we consider four nonexclusive factors set forth in *Estate of Larsen*: '(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of

the suspect.'" *George*, 2021 WL 3700918, at *5 (citing *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)).

**C. Qualified Immunity**.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Valverde by and through Padilla v. Dodge*, 967 F.3d 1049, 1058 (10th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted)). Qualified immunity is designed to protect "all but the plainly incompetent or those who knowingly violate the law." *Soza v. Demsich*, 13 F.4th 1094, 1099 (10th Cir. 2021) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When a defendant asserts qualified immunity at the summary judgment stage, it is the plaintiff's burden to prove (1) the defendant violated his constitutional rights; and (2) the law was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). The facts are viewed in Plaintiff's favor, as the non-movant, but "[a]t this stage, the plaintiff's version of the facts must have support in the record." *Lehman v. McKinnon*, No. 20-1312, 2021 WL 4129229, at *2 (10th Cir. Sept. 10, 2021) (citing *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018)).

For purposes of qualified immunity, the law is clearly established if Supreme Court or Tenth Circuit precedent, or the weight of authority from other circuits, would put a reasonable officer on notice that he was violating the Fourth Amendment. *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1210 (10th Cir. 2017). While there need not be a case exactly on point, existing caselaw must have placed the constitutional issue "beyond debate." *Soza*, 13 F.4th at 1099 (citing *Hope v.*

*Pelzer*, 536 U.S. 730, 741 (2002) and *White v. Pauly*, ⎯ U.S. ⎯, 137 S. Ct. 548, 551 (2017)). In other words, "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix*, 577 U.S. at 11–12 (citation omitted).

Courts are not to define "clearly established" law at a high level of generality. "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id*. at 12 (emphasis in original) (citation omitted.) "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Id*. (alteration in original) (quoting *Saucier,* 533 at 205). *See Reavis estate of Coale v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020). "The relevant, dispositive inquiry … is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202 (2001) (citation omitted).

### III. Analysis

Plaintiff alleges that Dailey's use of deadly force "was not objectively reasonable because neither he nor anyone else could claim any objective fear of imminent bodily harm by Debra Arbuckle at the time of the shooting." (Doc. 1 at 6.) Plaintiff also alleges that "Dailey's own reckless and deliberate conduct contributed to his decision to use deadly force…." (*Id*.) The complaint alleges that Dailey's actions were taken under color of state law and deprived Arbuckle of her Fourth Amendment right to be free from unreasonable seizures…."[13] Dailey argues he is entitled to summary judgment on the claim under the defense of qualified immunity, because the

---

[13] The complaint also alleged that Dailey deprived Arbuckle of her Fourteenth Amendment right not to be deprived of life or liberty without due process of law. (Doc. 1 at 6-7.) Plaintiff's response brief, however, makes clear Plaintiff is asserting only a deprivation of Fourth Amendment rights as applied to the state law by the Fourteenth Amendment. (Doc. 29 at 28.)

use of force was objectively reasonable under the circumstances such that it did not violate the Fourth Amendment, and because his conduct did not violate clearly established constitutional rights of which a reasonable officer would have known.  (Doc. 20 at 1.)

The court has discretion in deciding the order in which the two prongs of qualified immunity are addressed and, when appropriate, it does not need to address both parts of the test. *Soza*, 13 F.4th at 1099 (citing *Pearson*, 555 U.S. at 236–37).  In this instance, the court determines that Dailey is entitled to summary judgment under both parts of the qualified immunity test because Dailey's use of deadly force was objectively reasonable under the circumstances, and because it was not clearly established that using deadly force in the circumstances faced by Dailey was a violation of the Fourth Amendment.

### A.  **Fourth Amendment Analysis**.

1. Severity of the crime at issue.  The first *Graham* factor is the severity of the crime at issue.  *Graham,* 490 U.S. at 396.  Plaintiff argues that Arbuckle's flight from officers amounted to "at most … a misdemeanor," and Plaintiff further faults Dailey and the other deputies for "escalat[ing] the circumstances" by engaging in a high-speed pursuit.  (Doc. 29 at 9.)  The uncontroverted facts, however, show that by the time deadly force was used, Dailey and the other deputies had probable cause to believe the driver of the Volkswagen committed the felony offense of fleeing and eluding.  Kansas law provides in part that a driver of a motor vehicle who knowingly fails to stop for a pursuing police vehicle, when given a visual or audible signal to stop the vehicle, and who during the police pursuit commits five or more moving violations, is guilty of a severity level 9 "person felony."  K.S.A. 8-1568(b)(1)(E) & (c)(2).[14]  Failure to stop at red lights and stop

---

[14] Dailey's brief cites the wrong statute (K.S.A. 8-1506) in support of his argument that the driver committed a felony (Doc. 20 at 4), but it is clear from the context that Dailey intended to refer to K.S.A. 8-1568.  *See also* Doc. 29 at 9 (Plaintiff arguing that Arbuckle committed only a misdemeanor under K.S.A. 8-1568(b)(1)).

signs are considered moving violations under Kansas law. *See State v. Figures,* 2020 WL 2091079, *3 (Kan. Ct. App. May 1, 2020) (citing *State v. Jenkins,* 311 Kan. 39, 56, 455 P.3d 779, 791 (2020)). As recounted previously, officers saw the Volkswagen commit at least five moving violations during the pursuit and broadcast those violations over the radio. The uncontroverted video evidence shows that Adams and the other deputies were aware of facts supporting a reasonable belief that the driver of the Volkswagen committed a felony offense under K.S.A. 8-1568. Moreover, engaging in a high-speed vehicle flight from officers and running red lights and stop signs, as Arbuckle did, presented an extremely serious threat to public safety and to the officers. Even if the absence of traffic in the early morning hours significantly reduced the odds of other persons being injured by Arbuckle, it was arguably a mere fortuity that no other driver crossed her path as she was fleeing at high speed. Moreover, Arbuckle's flight meant the officers who pursued her were themselves exposed to the same danger. *Cf. Scott v. Harris,* 550 U.S. at 379-80 (2007) (video of police chase showed the suspect's vehicle "run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only-lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up.") In sum, the first *Graham* factor weighs in favor of a finding of reasonableness. *See Vette v. K-9 Unit Deputy Sanders,* 989 F.3d 1154, 1170 (10th Cir. 2021) ("[O]ur binding precedent indicates the first *Graham* factor weighs against the plaintiff when the crime at issue is a felony, irrespective of whether that felony is violent or nonviolent.")

Plaintiff argues "the minor crime at issue … did not justify a pursuit for the Wichita Police Department and did not justify Defendant Dailey's reckless pursuit and use of deadly force." (Doc. 29 at 10.) As recounted above, the uncontroverted facts show there was reason to suspect Arbuckle of a felony offense, not merely a misdemeanor, by the time of the shooting. Moreover, the fact

that officers pursued the Volkswagen at high speed does not render Dailey's later use of deadly force unreasonable. A police pursuit, in and of itself, does not amount to a seizure under the Fourth Amendment. *See California v. Hodari D.,* 499 U.S. 62, (1991) (a fleeing suspect is not seized if he does not yield to a show of authority); *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 834 (1998) (no Fourth Amendment seizure would occur where a "pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit.") And Plaintiff cites no authority for the proposition that a seizure is rendered unreasonable simply because it occurred after a high-speed chase. There is Tenth Circuit case law stating that the reasonableness inquiry examines in part whether an officer's "own reckless or deliberate conduct during the seizure unreasonably created the need to use [deadly] force," and "whether the officers approached the situation in a manner they knew or should have known would result in escalation of the danger." *Bond v. City of Tahlequah, Okla.,* 981 F.3d 808, 816 (10th Cir. 2020) (citations omitted), *reversed on other grounds by City of Tahlequah, Okla. v. Bond*, ___ S. Ct. ___, 2021 WL 4822664 (Oct. 18, 2021). But Dailey's pursuit of the Volkswagen – even if one assumes that his speed in joining the pursuit was excessive or even reckless – did not create the need to use deadly force, nor would an officer in his position have been aware that pursuing the vehicle in that manner would escalate the danger of a need for deadly force within the meaning of *Bond.* The circumstances under which deadly force was used were created when the driver of the Volkswagen backed up in an apparent attempt to flee after the high-speed pursuit had come to a stop. This is materially different from Tenth Circuit cases finding violations where officers recklessly created the very circumstance that required the use of deadly force. *See Bond,* 981 F.3d at 816-17 (citing cases where officers approached a suicidal individual in a car and attempted to grab his gun; where officers approached an intoxicated person who was wielding a baseball bat and shot him before

trying less lethal means; and where officers conducting a welfare check cornered and used pepper spray on a suicidal individual).  Tenth Circuit cases provide that only reckless and deliberate conduct that is "immediately connected" to the seizure is considered in determining whether an officer unreasonably created a need to use force.  *See Est. of Ceballos v. Husk*, 919 F.3d 1204, 1214 (10th Cir. 2019).  "Mere negligence or conduct attenuated by time or intervening events is not to be considered." *Id.* (citation omitted.)  In this instance, the high-speed pursuit was effectively over at the time of the shooting.  The pursuit cannot be said to be immediately connected to Dailey's use of deadly force.

Plaintiff does not specifically allege that the TVIs employed by Dailey constituted an unreasonable seizure.  But given Arbuckle's extremely dangerous driving, such an argument would be unavailing.  There are risks to the public from officers engaging in high-speed pursuits. But failing to pursue vehicles that flee from traffic stops also carries risks, including the danger of allowing dangerous drivers to continue unimpeded, allowing more serious crimes to go undetected, and creating an incentive for drivers to flee when officers try to stop them.  In *Scott v. Harris,* 550 U.S. 372 (2007), police engaged in a high-speed pursuit of a traffic violator and ultimately used a TVI maneuver that caused the suspect to crash and suffer serious injury.  In rejecting a Fourth Amendment argument that the police should have called off the high-speed chase in order to protect the public, the Supreme Court observed:

> It is obvious the perverse incentives such a rule would create: Every fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights. The Constitution assuredly does not impose this invitation to impunity-earned-by-recklessness. Instead, we lay down a more sensible rule: A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death.

*Id.* at 385–86.  *See also Lange v. California*, 141 S. Ct. 2011, 2031 (2021) (Roberts, C.J., concurring) (citations omitted) ("A fleeing suspect 'intentionally place[s] himself and the public in danger.'… Affording suspects the opportunity to evade arrest by winning the race rewards flight and encourages dangerous behavior.")

The wisdom of continuing to pursue the Volkswagen at high speeds was a judgment call on which reasonable persons – and reasonable law enforcement officers – might disagree, but it was not objectively unreasonable.  Dailey and the other deputies had an objectively reasonable basis for pursuing the Volkswagen at high speeds and it cannot be said that countervailing interests made the pursuit of the vehicle unreasonable. And as far as the use of deadly force in this case is concerned, Dailey's pursuit of Arbuckle at high speeds did not cause or increase the need to use deadly force and does not weigh in favor of a finding of unreasonableness under the Fourth Amendment.

      2.  <u>Whether the suspect poses an immediate threat to the safety of the officers or others.</u>

The second *Graham* factor – the "most important and fact intensive" – is whether the suspect poses an immediate threat to the safety of the officers or others. *George,* 2021 WL 3700918, at *4 (quoting *Graham*, 490 U.S. at 396).  The uncontroverted facts show that at the time of the shooting, a reasonable officer in Dailey's position would have had probable cause to believe that the Volkswagen driver posed a threat of serious physical harm to Johnson.  The videos show that the Volkswagen – despite its lack of one front tire and regardless of its precise speed – was capable of backing up at a sufficient speed to put in jeopardy the life or safety of a pedestrian in its path.  The videos also unquestionably show the Volkswagen was backing up on a path at or close to Johnson, who was standing near Marrero's front passenger door when the Volkswagen started backing up.  To Dailey, who was on the opposite side of the Volkswagen from Johnson and

who was aware Johnson was positioned near the passenger side of Marrero's car, Johnson reasonably would have appeared to be in the path of the Volkswagen. Johnson's body camera shows that by the time he recognized and appreciated that the Volkswagen was in fact backing up at him – prompting him to exclaim, "hey, hey" – the rate at which the Volkswagen was approaching left him only a couple of seconds to get out of the way. An officer in Dailey's position would have had objectively reasonable grounds to believe Johnson was in imminent danger of being struck by the Volkswagen. *See Reavis*, 967 F.3d at 988 ("[T]he question of whether there is no threat, an immediate deadly threat, or that the threat has passed, at the time deadly force is employed must be evaluated based on what a reasonable officer would have perceived under the totality of the circumstances."). *See also Tillis on behalf of Wuenschel v. Brown*, No. 19-15098, 2021 WL 4059492, at *6 (11th Cir. Sept. 7, 2021) ("Officer Brown did not fire his gun because Redwine was driving the Pontiac recklessly; he fired because the Pontiac started backing up while he was behind it. When a fleeing suspect drives his vehicle toward an officer who is standing only a few feet away, it is reasonable for the officer to believe that his life is in danger.") Moreover, once Dailey saw the Volkswagen backing up and appreciated the danger himself, he had only a moment to decide whether to shoot at the driver in order to prevent the Volkswagen from potentially striking Johnson. Given the rate at which the Volkswagen was closing on Johnson, two seconds may overstate the actual window Dailey had to employ his firearm to prevent harm to Johnson, in part because the videos show that any delay would have brought Marrero and Slay, and perhaps Johnson, directly into Dailey's line of fire. Even so, Dailey yelled a warning at the Volkswagen driver before firing his weapon.

Dailey fired six shots in rapid succession at the driver, in a span of 1.19 seconds. His testimony was that he stopped firing because he saw that the Volkswagen stopped backing up.

(Doc. 201 at 3.)  There is uncontroverted evidence that Dailey had 12 rounds left in his pistol when he stopped firing.  Video replay indicates the Volkswagen may have stopped moving backwards after the second or third shot was fired.  Plaintiff does not specifically argue that Dailey's firing of the last three or four shots amounted to an unreasonable seizure.  Nor will the uncontroverted facts support such a claim.  If deadly force was in fact justified, then it was reasonable for Dailey to continue to apply that force until a reasonable officer in his position could ascertain that the imminent threat to Johnson had ended.  Given the split-second timing between the stopping of the Volkswagen, Johnson getting behind Marrero's bumper, and Dailey ceasing to fire, the use of six shots in rapid succession was not excessive or unreasonable under the circumstances.  There is no basis in the evidence for concluding that Dailey could have recognized any sooner that the danger had abated.  *Cf. Plumhoff v. Rickard,* 572 U.S. 765, 777 (2014) (noting that "if lethal force is justified, officers are taught to keep shooting until the threat is over.") (citation omitted.)

A.  Estate of Larsen Factors.    As indicated previously, in assessing the seriousness of a threat as to which deadly force was used, Tenth Circuit cases call for examination of four nonexclusive factors.  *See Estate of Larsen,* 511 F.3d at 1260.

i.  Order to drop weapon.    The first factor examines "whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands."  *Id.*    The "weapon" in this instance was a car, which when driven at a pedestrian is capable of causing death or serious injury.  *See Reavis Estate of Coale v. Frost,* 967 F.3d 978, 986 (10th Cir. 2020) ("[A]n officer may use deadly force when 'threatened by [a] weapon (which may include a vehicle attempting to run over an officer)'" (citation omitted).  The uncontroverted facts show Dailey yelled a warning immediately before firing at the driver.  Despite the warning, the Volkswagen continued backing up until Dailey had fired at least two shots. Plaintiff complains that Dailey gave

Arbuckle no time to comply with commands before firing at her.  (Doc. 29 at 13.)  But Arbuckle had time to comply with Marrero's order to turn the car off, which she failed to do, and given Dailey's objectively reasonable belief that Johnson was in jeopardy from the Volkswagen, there was no time to give further warnings and still use force to prevent potential injury to Johnson. Dailey gave all the warning the circumstances reasonably permitted.  Moreover, the extensive high-speed chase, the multiple attempts at a TVI, and the order from officers to turn the car off had all proven insufficient to deter the driver from backing up towards Johnson.  Given the apparent danger to Johnson, it was reasonable for an officer in Dailey's position to employ force without waiting or giving additional warnings.  This factor weighs in favor of a finding for Dailey.

   ii.  Hostile motions.  The second factor under *Estate of Larsen* is "whether any hostile motions were made with the weapon towards the officers." *Estate of Larsen,* 511 F.3d at 1260.  It is of course impossible to know what Ms. Arbuckle was thinking at the time of the incident.  But from the perspective of a reasonable officer in Dailey's position, the fact that the Volkswagen suddenly backed up at or near Johnson – especially after the Volkswagen driver made extraordinarily dangerous attempts during the pursuit to flee and to resist being forcefully stopped – would reasonably be considered a hostile motion posing an immediate threat to Johnson's safety. The manner in which the Volkswagen was driven at the time of the shooting reasonably supports an inference that the vehicle was being used to threaten the officers with injury.[15]  The second factor thus weighs in favor of Dailey.

   iii.  Distance.  The third factor under *Estate of Larsen* is "the distance separating the officers and the suspect."  *Id.*  Plaintiff contends that at the time of the shooting Johnson "was over twenty

---

[15] The court notes that the videos indicate a horn sounded as the Volkswagen was backing up just before the shots were fired.  (Exh. J, Johnson Body Cam at 2:00).  No party makes any argument concerning the significance of the horn.

feet away" from the Volkswagen. (Doc. 29-1 at 16.) That allegation is not supported by the materials cited. For example, Plaintiff cites a portion of Johnson's deposition testimony (*id.*, citing "Exhibit B, Johnson Dep., 27 at 3-8"), but that excerpt only indicates that a Dodge Charger is about 16 feet long. (Doc. 29-3 at 27.) The ensuing testimony addressed how far away Johnson was from the Volkswagen when he was positioned by Marerro's front passenger door and the Volkswagen was on the curb – a distance that Johnson could not estimate. (*Id.*) When asked later how many feet from the Volkswagen he would have been at the time of the shooting, Johnson responded, "I don't know." (*Id.* at 52.) Plaintiff also cites a nine-second excerpt from Johnson's dash cam (Doc. 29-1 at 16, "Exhibit K, Johnson Dash Can at 1:39-1:48"), but does not show that it supports the allegation. The uncontroverted evidence, including Johnson's and Dailey's body cam videos, shows beyond reasonable dispute that Johnson was less than a car's length away from the Volkswagen's rear bumper immediately before the shooting, although it is impossible to determine the precise distance. What can be said with certainty is that the distance between Johnson and the Volkswagen was dwindling rapidly. It is also indisputable from the videos that Johnson was in the vicinity of the passenger-side rear quarter panel of Marrero's car immediately before (i.e., within approximately one second) of the first shots being fired. (*See e.g.,* Exh. J, Johnson Dash Cam at 1:43-44.) As a matter of math, it can be determined that a car moving at 5 miles per hour will travel 7.3 feet per second. Dailey's body cam shows that by the time he fired the first shot, the rear bumper of the Volkswagen had already traveled from well in front of Marrero's car to somewhere midway along Marrero's car, while Johnson's body cam shows he was close to Marrero's rear bumper when the first shots were fired. In other words, the Volkswagen was close enough to Johnson prior to the shooting that he was in imminent danger of being struck, with only a few seconds to get out of the way. Under these circumstances, it was reasonable to use deadly

force to prevent the vehicle from possibly striking Johnson, as Dailey had probable cause to believe Johnson was in imminent danger of serious injury. Dailey simply did not have time to wait and verify that Johnson was able to move out of the way. Had Dailey waited, and had Johnson stumbled or been unable to get out of the way, it would have been too late at that point to use force to prevent the Volkswagen from striking Johnson. The distance factor thus weighs in favor of a finding of reasonableness.

     iv. <u>Manifest intentions</u>. The fourth *Estate of Larsen* factor is "the manifest intentions of the suspect." *Estate of Larsen,* 511 F.3d at 1260. This factor weighs strongly in favor of a finding of reasonableness. The act of suddenly backing up in the dark among several officers on foot, after a high-speed chase and several TVI maneuvers finally forced the car to stop, objectively manifested a plan to flee either by intentionally or recklessly using the Volkswagen as a weapon against the officers near the vehicle. Again, it is impossible to ascertain Ms. Arbuckle's actual state of mind, or to say how clouded her judgment may have been at the time, but objectively speaking her outward actions manifested an intention to continue her flight either by striking the officers with the Volkswagen or threatening to strike them, such that Johnson was forced to scramble to get out of the way. In either event, the act manifestly threatened the officers, and Johnson in particular, with serious injury. This factor also weighs in favor of a finding for Dailey.

     3. <u>Whether the suspect is actively resisting arrest or attempting to evade arrest by flight</u>. The third and final *Graham* factor is whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham,* 490 U.S. at 396. This factor weighs strongly in favor of a finding that Dailey's use of force was reasonable. The uncontroverted facts show that Arbuckle went to incredible lengths to avoid being seized by the officers. Fleeing at speeds of over one hundred miles per hour, multiple instances of running red lights or stop signs, driving over spike

strips, and continuing to drive on after not one but two attempted TVI maneuvers, all reasonably indicated the driver of the Volkswagen would go to extraordinary and dangerous lengths to continue fleeing if possible, and would thereby place others in danger of serious injury.  After the third TVI successfully brought the Volkswagen to a stop, with its front rim on a curb and a tree blocking its forward progress, it appeared for a few seconds that the pursuit was over.  Despite that, the driver failed to comply with an order to turn the car off and proceeded to back up in the dark in the midst of several patrol cars and officers on foot.  Plaintiff argues that Arbuckle "posed no … threat to others on the road because her car was disabled and hemmed in by patrol vehicles" such that "[s]he could not continue."  (Doc. 29 at 20.)  While there were in fact several patrol cars around the Volkswagen when it began to back up, it is beyond reasonable dispute that the Volkswagen was not completely hemmed in, and the driver's actions objectively indicated she would attempt to flee regardless of the close presence of officers on foot. Plaintiffs' allegations that the Volkswagen was "disabled" at that point or "was only capable of moving at speeds less than five miles an hour" (*id.* at 19, 20) are similarly refuted by uncontroverted facts showing otherwise.  While the damage to the vehicle's tire surely would have prevented it from obtaining high speeds, its ability to back up near Marrero's car within a few seconds showed the vehicle was still capable of posing a danger to an officer in its path.  The observable facts would have indicated to a reasonable officer in Dailey's position that the Volkswagen driver was actively and dangerously resisting arrest and was attempting to flee by driving the car at or near the officers.

Summation. Considering the totality of the circumstances, the court concludes Dailey's use of deadly force in these circumstances was reasonable.  The use of deadly force "is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others." *Redd v. City of Oklahoma City*, No.

20-6145, 2021 WL 3909982, at *11 (10th Cir. Sept. 1, 2021) (citation omitted).  The driver of the Volkswagen, who had already manifested a recklessness disregard for safety by fleeing officers at high speeds and running red lights and stop signs, ignored a command to turn the car off and suddenly backed up in the dark toward one of the officers. Dailey was aware of Johnson's presence near Marrero's car and saw the Volkswagen backing up in that direction.  In doing so, the driver of the Volkswagen manifested a determination to keep going regardless of the presence of officers on foot behind the vehicle.  From the facts confronting him, Dailey had probable cause to believe Johnson was in imminent danger of being seriously injured by the Volkswagen.  He attempted a verbal warning before using force to try and stop the Volkswagen.  It is true, as slow-motion replays show, that Johnson actually managed to get behind Marrero's rear bumper just before Dailey began firing.  But as discussed above, Dailey did not have time to see if Johnson could make it to safety and still use force to protect Johnson if he was unable to get out of the path of the Volkswagen in time. *Cf. Serrano v. United States,* 766 F. App'x. 561, 567 (10th Cir. 2019) ("[T]he truck could become an active weapon in the short amount of time it would take to press the gas pedal – less than a second.  All the deputies were on foot close to the truck, and 'it goes without saying that an officer in close quarters is no match for a two-ton vehicle.' … With events moving so rapidly and 'in these close quarters, a reasonable officer could conclude that his or her life was in danger and employ deadly force to stop the vehicle.'")  (citation omitted.)

While the reasonableness of the use of deadly force depends in part on whether officers "were in danger at the precise moment that they used force" (*Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021), "[t]he calculus of reasonableness must embody allowance for the fact that police officers are forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a

particular situation." *Graham*, 490 U.S. at 396-97.  It is one thing to replay videos of the incident in slow-motion "in the peace of a judge's chambers" (*id.* at 396) and see that Johnson was actually able to get behind Marrero's bumper in time to avoid the Volkswagen.  It is another matter to consider the real-world judgment Dailey was forced to make.  This case turns on the fact that the Volkswagen driver suddenly placed the life of an officer in imminent danger, requiring Dailey to make an immediate decision about whether to use deadly force.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396.  In hindsight, it can be said that Johnson was able to get out of the way and would probably have been unharmed had Dailey decided not to use force.  But a reasonable officer in Dailey's position could not have been sure of that outcome under the circumstances and given the limited time he had to make the decision on using force. *Cf Thomas v. Durastanti,* 607 F.3d 655, 666 (10th Cir. 2010) ("Although Agent Durastanti's reasonable perceptions are what matters, he had mere seconds to react, and his actions in firing the first couple of shots were reasonable even if mistaken.  An officer may be found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances.")  Dailey had probable cause to believe Johnson was in imminent danger, which in the totality of circumstances ultimately makes his actions objectively reasonable under the Fourth Amendment.  Because Plaintiff has failed to cite evidence from which a jury could reasonably conclude that Dailey violated Arbuckle's Fourth Amendment rights, Dailey is entitled to summary judgment.

### B.  Qualified Immunity Analysis.

Even if Dailey's actions could be found to be a violation of Arbuckle's rights under the Fourth Amendment, Plaintiff has not shown that his actions violated clearly established law.  As

such, Dailey is entitled to summary judgment under the second part of the qualified immunity test, which places the burden on Plaintiff to show that the law was clearly established at the time of the alleged violation. *Soza v. Demsich*, 13 F.4th 1094, 1099 (10th Cir. 2021).

With respect to Dailey's assertion that he used deadly force to prevent harm to Johnson, Plaintiff contends Dailey violated clearly established law as set forth in *Zia Trust Co. ex rel. Causey v. Montoya,* 597 F.3d 1150, 1155 (10th Cir. 2010).  (Doc. 29 at 25.)  Plaintiff argues Johnson was not in imminent danger because he was "in a 'position of cover' behind Deputy Marrero's patrol vehicle and over 20 feet away from Debra's car."  (*Id.*)  Plaintiff further asserts that Dailey "was aware of the great distance between [Arbuckle's] car and Deputy Johnson's position of cover," and that "[j]ust before shooting [Arbuckle], Deputy Dailey could see Deputy Johnson and knew his position."  (*Id.* at 27.)  Plaintiff argues the Tenth Circuit's finding in *Zia Trust* that an officer's use of deadly force against the driver of a van fifteen feet away was unreasonable shows that Dailey's actions violated clearly established law.  (Doc. 29 at 26.)

Plaintiff's reliance on *Zia Trust* is unavailing for a number of reasons, not the least of which is that the van that was fired upon in that case "was obviously stuck on a retaining wall" and "jumped forward less than a foot, if at all, when [the driver] revved the engine."  *Zia Trust,* 597 F.3d at 1155.  The van in *Zia Trust* thus did not pose an immediate threat to an officer fifteen feet away – and really did not pose any threat at all – because it was "stuck" and was essentially immobile.  *See id.* ('we cannot say that a van fifteen feet away, which according to plaintiffs was clearly stuck on a pile of rocks, gave Officer Montoya probable cause to believe that there was a threat of serious physical harm to himself or others.")  By contrast, the Volkswagen in this case was unquestionably mobile despite its lack of a front tire.  It obviously was not stuck, as it was able to back up and close the distance to an officer standing behind it within a matter of seconds.

*Zia Trust* thus does not clearly establish that Dailey's use of deadly force as the Volkswagen backed up toward Johnson was unlawful.

Plaintiff's brief elsewhere argues this case is like *Reavis.* (Doc. 29 at 11.)  In *Reavis,* the Tenth Circuit found a potential Fourth Amendment violation from evidence that an officer who jumped out of the way of an approaching vehicle fired at the driver "from behind and to the side" after the vehicle "had nearly passed him." *See Reavis,* 967 F.3d at 987.  Under the circumstances, "a reasonable officer would have perceived he was shooting at the back and side of a fleeing – not an oncoming vehicle," and thus "would have known when he raised his weapon and fired that there was no immediate threat of harm to himself…." *Id.* at 991.  Evidence in *Reavis* further showed "there was no immediate danger to other officers or civilians…." *Id.* at 990.  Insofar as Dailey contends that he, rather than Johnson, was in imminent danger of being struck by the Volkswagen, *Reavis* might have some application.[16]  But *Reavis* does not establish that Dailey's use of force to protect Johnson was unlawful when Dailey reasonably perceived that the Volkswagen was headed toward Johnson.  For reasons previously discussed, Dailey's belief that Johnson was in imminent danger from the Volkswagen was reasonable.  *Reavis* says nothing about the use of deadly force in the case of a reasonable belief of imminent danger to others.  It thus does not show that Dailey violated clearly established law.  *Cf. City of Tahlequah*, 2021 WL 4822664, at *2 (specificity is "'especially important in the Fourth Amendment context,' where it is 'sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'") (citation omitted.)

---

[16] Because the record shows Dailey is entitled to summary judgment on his assertion that deadly force was justified by an imminent threat to Johnson, the court does not address Dailey's claim that the threat of harm to himself also justified the use of force.

Plaintiff also cites *Fancher v. Barrientos,* 723 F.3d 1191 (10th Cir. 2013), and argues the Tenth Circuit denied qualified immunity in that case although it "involve[d] much more dangerous behavior" than the instant case. (Doc. 29 at 12.) *Fancher* involved a suspect who disregarded an officer's commands, attempted to wrestle the officer's gun away from him (causing it to discharge), and then attempted to flee by getting in the officer's nearby patrol car, which had two loaded long guns in it. *Fancher,* 723 F.3d at 1196. The officer, with his gun drawn, approached and tried to remove the car keys with his left hand, as the engine was racing. The suspect shifted the car into reverse, at which point the officer fired his weapon at the suspect, hitting him in the chest, and causing the suspect to slump. *Id.* at 1196-97. The car began to press on the officer's shoulder, pushing him away, and he took two or three steps away from the car. The officer "testified that he felt safer after he backed away from the vehicle." *Id.* at 1197. As the car continued to move in reverse away from the officer, he continued shooting at the suspect, firing six additional shots. The Tenth Circuit affirmed the denial of qualified immunity to the officer based on evidence that the officer "fired six shots into a suspect who was 'no longer able to control the vehicle, to escape, or to fire a long gun" and thus no longer presented a danger to the public or the officer, and the officer did so after he stepped back from the car and saw the suspect slump, something that allowed the officer "enough time … to recognize and react to the changed circumstances and cease firing his gun." *Id.* at 1201. *Fancher* bears little similarity to the facts of the instant case, which is based on the perceived danger of the Volkswagen moving toward – not away from – Deputy Johnson, and which involved no break or change in circumstances sufficient to give Dailey time to recognize that the danger had abated and react to the changed circumstances. *Fancher* thus does not show that Dailey's conduct violated clearly established law.

A closer parallel to the instant case is *Serrano v. United States,* 766 F. App'x 561 (10th Cir. 2019), where the Tenth Circuit found it was reasonable for a U.S. Marshal to shoot a suspect attempting to flee in a vehicle.  The suspect in that case had a history of flight, and he started up his truck when surrounded by officers on foot, turning the steering wheel toward one of the deputies in front of the truck.  Another officer, believing the suspect was going to run the deputy down, fired two shots at the suspect.  The Tenth Circuit found the use of force was reasonable because the officer had probable cause to believe there was a threat of serious physical harm to the deputy – despite the fact that the truck was stationary at the time.  The court noted the officer "had only moments to react to the circumstances confronting him," and found that given the limited time and the close quarters involved, a reasonable officer could conclude that the life of the deputy was in danger.  *Id.* at 567.

Another case with somewhat similar facts is *Carabajal v. City of Cheyenne, Wyo.*, 847 F.3d 1203 (10th Cir.), *cert. denied*, ___U.S. ___, 138 S. Ct. 211 (2017).  In that case, a car that initially stopped for police "moved forward slowly toward the middle of the street, and in the direction of [an officer]."  *Id.* at 1208.  The officer "stepped toward the middle of the street and in front of [the vehicle], and fired two rounds" from a shotgun at the suspect.  *Id.*  The court found that "in these close quarters, a reasonable officer could conclude that his or her life was in danger and employ deadly force to stop the vehicle."  *Id.* at 1209.  Like the instant case, the plaintiff argued that the driver in that case did not accelerate at the officer, that "his foot came off the brake" and that the vehicle "was moving slowly and was of little threat to the safety of others," but the court found these assertions unpersuasive.  Like the videos in the instant case, the videos in *Carabajal* showed "that the scene involved close quarters" and that "the vehicle was moving in [the officer's] direction," such that a reasonable officer could have perceived that the driving was deliberate.  *Id.*

at 1210.  Given the driver's prior flight, his notice of the police presence, and the fact that a warning had been given, the officer was "not required to stand down and hope for the best" when the car began advancing, and "the fact that the vehicle was moving slowly does not eviscerate the threat…."  *Id.*  While not identical to the instant case, these facts more closely parallel the circumstances confronting Dailey than any case cited by Plaintiff that found the use of deadly force against a driver to be unlawful.  *Cf. Brosseau v. Haugen,* 543 U.S. 194 (2004) (officer did not violate clearly established rights by shooting driver who was about to flee where the officer was "fearful for the other officers on foot who [she] believed were in the immediate area, [and] for the occupied vehicles in [the driver's] path and for any other citizens who might be in the area.") (citation omitted.)

Plaintiff cites no established precedent that would have put Dailey on notice that his use of force was unreasonable.  "It is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"  *City of Tahlequah*, 2021 WL 4822664, at *2.  Plaintiff has thus failed to show that Dailey's actions violated clearly established law.

### IV.  Conclusion

Defendant Kaleb Dailey's motion for summary judgment (Doc. 20) is GRANTED.  The action is hereby DISMISSED.  The clerk is directed to enter judgment accordingly.  IT IS SO ORDERED this 23rd day of November, 2021.

_____ s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE